The **ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant,**

v.

**William Barney HAM, Appellee.**

No. 11720.

Court of Civil Appeals of Texas, Austin.

May 6, 1970.

Appellant's and Appellee's Rehearings Denied May 27, 1970.

O'Brien & Richards, Chilton O'Brien, Beaumont, McLeod, Alexander, Powel & Apffel, Galveston, for appellant.

Camp, Ellett & Camp, Robert L. Ellett, Cameron, Helm, Jones & Pletcher, David H. Burrow, S. M. Helm, Houston, for appellee.

O'QUINN, Justice.

William Barney Ham, a brakeman employed by the Atchison, Topeka, and Santa Fe Railway Company, brought this lawsuit under provisions of the Federal Employers' Liability Act (Title 45, section 51 et seq., U.S.C.A.) for personal injuries sustained while at work on a train passing through Cameron, Texas, enroute from Temple to Houston.

Upon the jury's answers to sixteen special issues, the trial court entered judgment April 16, 1969, awarding damages to Ham in the sum of $79,463.75.

Appellant railway company under fifteen points of error brings this appeal. Appellee Ham has replied under nine counterpoints.

Appellee was the rear brakeman and riding alone in the caboose of appellant's train enroute on August 10, 1967, from Temple to Houston. The train was moving through the city of Cameron when it struck an automobile stalled on the Gillis Street crossing in Cameron, and appellee was injured when he was thrown about the caboose after an emergency application of the train's brakes in an effort to avoid the collision.

Appellant's train was a fast freight, containing 119 cars, made up in Temple. Between Temple and Cameron the train operators were directed by radio to pick up orders at Cameron. It was necessary for Ham, as the rear brakeman, to climb down from the cupola where he was riding in order to pick up the orders at Cameron. While Ham was climbing down the cupola ladder, when he had one foot on the caboose floor, he heard the air indicating an emergency application of the train brakes.

The emergency application of the brakes was made because as the train approached the Milam Grain Crossing (also known as the Old Oil Mill Crossing) in Cameron the engineer discovered the rear of an automobile extending into the track at the Gillis Street, or jail house, crossing. The engineer testified that the speed limit set by the Santa Fe through Cameron was fifty miles per hour, and that as he approached Cameron he had reduced the speed of the train to forty-eight miles an hour. It was at the reduced speed that the brakes were applied.

The slack action [1] of the train following application of the brakes was severe in the caboose and caused Ham to lose his hand hold on the ladder, and he was thrown to the back end of the caboose. As a result of being thrown in this manner, Ham contended that he was unable to work afterwards because of pain in his back, legs, back of his neck, and in his head.

Ham contended in the trial of the case that the negligence of the railway which caused his injuries was (1) excessive speed, (2) failure to warn him of the application of the brakes, and (3) unsafe working conditions in the caboose.

Ham, who was 66 years of age and had worked for the railway 48 years, testified that emergency brake applications were frequent occurrences on the railroad, occurring for several different reasons. Ham stated that slack action always occurred when a train made an emergency stop and that it was always different and never quite the same. Ham testified that his injuries were caused by slack action of the train when the emergency occurred and brakes were applied in 'the Cameron incident.

The jury found that the railway did not fail to furnish Ham a reasonably safe

---

1. In Southern Pacific Company v. State of Arizona ex rel. Sullivan, Attorney General of the State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915, the Supreme Court, in considering validity of an Arizona statute regulating the length of trains, discussed slack action:

"The principal source of danger of accident from increased length of trains is the resulting increase of 'slack action' of the train. Slack action is the amount of free movement of one car before it transmits its motion to an adjoining coupled car. This free movement results from the fact that in railroad practice cars are loosely coupled, and the coupling is often combined with a shock-absorbing device, a 'draft gear', which, under stress, substantially increases the free movement as the train is started or stopped. Loose coupling is necessary to enable the train to proceed freely around curves and is an aid in starting heavy trains, since the application of the locomotive power to the train operates on each car in the train successively, and the power is thus utilized to start only one car at a time.

The slack action between cars due to loose couplings varies from seven-eights of an inch to one and one-eighth inches and, with the added free movement due to the use of draft gears, may be as high as six or seven inches between cars. The length of the train increases the slack since the slack action of a train is the total of the free movement between its several cars. The amount of slack action has some effect on the severity of the shock of train movements, and on freight trains sometimes results in injuries to operatives, which most frequently occur to occupants of the caboose. The amount and severity of slack action, however, are not wholly dependent upon the length of train, as they may be affected by the mode and conditions of operation as to grade, speed, and load. And accidents due to slack action also occur in the operation of short trains."

place to work and that failure to advise Ham by radio that the brakes were being applied was not negligence. The jury also acquitted Ham of contributory negligence in not having a sufficiently firm hold on a stationary object to prevent injury. The jury found that Ham's injuries were not the result of an unavoidable accident.

In response to a series of special issues relating to emergency, the jury found that the train crew acted under an emergency, and that the crew, after the emergency arose, did what "ordinarily prudent persons would have done under the same or similar circumstances."

In this series, the jury was asked:

"Do you find from a preponderance of the evidence that the acts or omissions of the train crew under such emergency * * was the sole proximate cause of W. B. Ham's injuries?"

The jury replied, "It was the sole proximate cause."

In answer to earlier special issues the jury found that "the train was being operated at a rate of speed in excess of that at which a person of ordinary prudence would have operated same under the same or similar circumstances."

The jury found that "such excessive speed * * * contributed to cause in whole or in part to the plaintiff's injuries. * * *"

Appellant railway urges that the findings of the jury (1) that excessive speed of the train contributed "in whole or in part" to cause Ham's injuries and (2) the acts and omissions of the crew under the emergency were the "sole proximate cause" are in "irreconcilable conflict."

Appellant argues:

"A Defendant is not liable for any injury or damage that is not a consequence of his negligence. If the sole cause of the Plaintiff's injuries or damages is the act of someone other than Defendant or a nonnegligent act of Defendant, or anything else except a negligent act or omission of the Defendant, there is no liability. These assertions are so fundamental that little citation of authority is required to support them." Citing Harper and James, The Law of Torts, vol. 2, Ch. XX, p. 1108, sec. 20.1.

The issue of "sole proximate cause" as submitted by the trial court dealt with the "acts and omissions of the train crew under such emergency" and did not inquire of the jury whether the presence of the stalled automobile on the tracks, which brought about the· emergency, was the "sole proximate cause" of Ham's injuries.

■ The issue of "sole proximate cause" is not available to a defendant as to his own acts and is available only to discover whether the act of a third party or an extraneous happening was the sole cause of plaintiff's injury. International-Great Northern R. Co. v. Acker, 128 S.W. 2d 506 (Tex.Civ.App., Eastland, 1939, writ dsmd., jmt. cor.); Panhandle & Santa Fe Ry. Co. v. Ray, 221 S.W.2d 936 (Tex.Civ. App., Austin, 1949, writ ref., n.r.e.); Lewis v. Lansing, 325 S.W.2d 214 (Tex.Civ. App., Fort Worth, 1959, no writ); Dallas Transit Company v. Tolbert, 337 S.W.2d 617 (Tex.Civ.App., San Antonio, 1960, writ ref., n.r.e.); Querner v. De Spain, 339 S.W.2d 723 (Tex.Civ.App., San Antonio, 1960, no writ); Missouri-Kansas-Texas Railroad Company v. Wright, 311 S.W. 2d 440 (Tex.Civ.App., Fort Worth, 1958, writ dsmd. by agreement).

■ When the issue of "sole proximate cause" is submitted, as in this case, pertaining to acts or omissions of the defendant, it amounts to surplusage since a finding of "a" proximate cause is all that is necessary to establish negligence on the part of the defendant. 6 Baylor Law Review 462 (1954) and cases cited.

■ The purpose of the emergency doctrine, which is applicable only to negligence arising after the emergency arises, is

to lessen the standard of care that a person must exercise in an emergency. To require a finding of sole proximate cause in order for the doctrine to become effective would destroy any protection the doctrine might afford the plaintiff. "There could be no finding of primary negligence on the part of the defendant that would not conflict with the sole proximate cause issue on sudden emergency." Elmer Parrish, 23 Tex.Bar Jour. 725, 784 (1960) and cases cited.

In Harper and James, the authority relied upon by appellant, it is stated:

"Through all the diverse theories of proximate cause runs a common thread; all agree that defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is liability. This notion is not a metaphysical one but an ordinary, mater-of-fact inquiry into the existence of a causal relation as laymen would view it. Clearly this is not a quest for a *sole* cause. Probably it cannot be said of any event that it has a single causal antecedent; usually there are many. For the purpose of the present inquiry it is enough that defendant's negligence be *a* cause in fact of the harm." Harper and James, Vol. 2, p. 1110, sec. 20.2 (Emphasis by the authors.)

In the case before us, the jury found that the excessive speed of appellant's train, which existed prior to the sudden emergency, was negligence and contributed in whole or in part to cause plaintiff's injuries. Thus the fault of the defendant was established, and the finding that the things the crew did and did not do under the subsequent emergency were the sole proximate cause of defendant's injuries became meaningless and immaterial. If the trial court had refused to submit the issue, though requested by appellant, the action of the trial court would be sustained on appeal.

The eminent legal writer and teacher, Leon Green, a recognized authority in the field of torts, said:

"* * * the only possible excuse for using 'sole proximate cause' is for the purpose of indicating that defendant's negligence did not contribute to plaintiff's hurt, but *that the hurt was caused by some third person or other factor for which defendant is not responsible.*" 28 Tex.L.R. 471, 481 (1950) and cases cited. (Emphasis added.)

The only other factor, or third person, concerned in the case at bar was the stalled automobile, or its driver, sitting on the tracks in view of appellant's engineer. As we have observed, the jury was not asked to find whether the presence of the automobile, creating the emergency under which the train crew acted, was the sole cause of Ham's injuries.

Appellant railway argues that the slack action of the train was something over which the defendant had no control and that the severe slack action was the cause of the brakeman's injuries. The evidence was conflicting as to whether the slack action of the train would have been greater or less at a slower speed than forty-eight miles an hour, the speed at which the train entered Cameron. In finding that the excessive speed of the train contributed to the brakeman's injuries the jury impliedly concluded that, since Ham was thrown about the caboose when emergency brakes were applied, the slack action was more severe at forty-eight miles an hour than it would have been if the train had been going at a slower rate such as a person of ordinary prudence would have been traveling. There was evidence of probative force to support the finding of the jury and the reasonable inferences to be drawn from such finding.

In actions under the Federal Employers' Liability Act the Supreme Court of the United States has held:

"The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the em-

ployer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference." Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

The Dallas Court of Civil Appeals observed that "The Congress has seen fit by statute to supplant the common-law duty of railroads to employees by the more drastic duty of the 'In-whole-or-in-part' causation concept," in Missouri-Kansas-Texas R.R. Co. v. Shelton, 383 S.W.2d 842 (Tex.Civ. App., 1964, writ ref. n.r.e., cert. denied, 382 U. S. 845, 86 S.Ct. 54, 15 L.Ed.2d 85).

■ We overrule appellant's points nine and ten and hold that the jury findings of speed and causation were controlling and were not in conflict with the sudden emergency findings in response to inquiries regarding sole proximate cause.

Under its first and second points appellant contends that Ham was injured by slack action of the train, which could not be eliminated or controlled, and that the jury's findings that the speed of the train was excessive and contributed to cause in whole or in part the injuries Ham received should have been disregarded by the trial court because slack action would have occurred as a result of the emergency application of brakes at any speed.

As we have observed, the testimony concerning the cause in fact relationship between excessive speed and the injuries Ham sustained is in conflict. Ham testified that it was the speed of the train that caused him to get hurt. He testified that he was injured when thrown toward the back of the caboose during the emergency application of the train's brakes and that the slack action was unusually severe at the time.

It is undisputed that the train, consisting of 119 cars, entered Cameron at a speed close to 50 miles an hour on a down grade to the point where the brakes were applied in the emergency. The crossing at which the vehicle was stalled on the tracks was one of seven such crossings, located about one block apart, in the city of Cameron. The front part of the train had heavy tonnage and the back part of the train had more of the empty cars.

One witness, an air brake supervisor for appellant, testified that, with the front of the train being heavier than the back part with its empty cars, the major braking or holding force when the brakes were applied, would be on the rear half of the train. He also testified that if Ham was injured by being thrown toward the rear of the caboose, this resulted from the force of the loaded cars at the front of the train running away from the empty cars because the braking force would be more efficient on the empty cars.

Another witness, who had been in railroad work more than 30 years and qualified to drive engines "20 odd years," described the force that throws an object backward on a train upon emergency application of brakes as a sort of back lash after the slack action expires, and when the speed and momentum of the train momentarily makes a surge from the "tremendous weight and speed." The witness agreed that the weight and velocity of the train under such circumstances are working against the brakes and, being stronger than the brakes, jerk the train forward. This force, the witness testified, "usually at high speed" not uncommonly is sufficient "to jerk out drawbars or even pile some of cars up because they pull in half." The witness testified that as a young man he had witnessed this force exerted on a conductor, riding in the caboose of a train, with such violence that the chair in which the conductor was sitting was ripped from the floor, to which it was held by screws, and threw the trainman toward the rear door of the caboose.

The conductor on appellant's train testified that a "man back on the caboose gets more slack action" than one riding on the engine. When asked to tell what causes slack action, the witness stated:

"Just slack in between each car and maybe the way the train is made up. I mean where your loads and empties are. If you happen to have loads on the rear end, it will maybe shove forward where your empties would maybe take hold quicker and jerk back."

The conductor also testified that the engineer makes one brake application going into Cameron to slow the train down and to keep the train bunched. The engineer testified that slack action is greater when the train is bunched up, as opposed to being stretched out. The conductor testified that when brakes are applied in emergency resulting in cars being thrown off the tracks it is usually at high speeds, but that from his experience, "when we were going faster when it goes into emergency it's not quite as bad as when it's slow."

An instructor in physics at Temple Junior College testified, in contradiction of the air brake supervisor, that the heavier the car the more braking force it has because of the greater weight pressing the tracks. The physics instructor and other of appellant's witnesses testified that slack action causes an object to be thrown forward more severely at slow speeds than at high speeds. The air brake supervisor testified that considering the make-up of the train, with empty cars at the back and loaded cars at the front, the ideal condition for handling the train in an emergency would be with the train stretched, not bunched. One witness, qualified more than 20 years as an engineer, testified that a good engineer will keep the slack out of the train and never let it bunch up.

The theory of Ham's case is that the force that threw him backward, and not forward, was generated by the heavily-loaded cars at the front of the train pulling away from the empty cars at the rear

on which the brakes had worked more effectively, and that this force, which caused his injuries, was greater at high speed than it would have been at slow speed.

There was sufficient testimony to support this theory, and the findings of the jury indicate that the jury believed this testimony and rejected testimony to the contrary. Ham testified that excessive speed caused his injuries and that slack action is greater at a speed of 50 miles an hour than at 30 miles an hour. In answering special issues No. 1 and No. 2, the jury found the speed of the train excessive and a contributing cause of Ham's injuries. We find no error there and overrule appellant's first two points of error. It follows that we overrule appellant's third point that it was error to submit the issue as to excessive speed.

Under points 4 through 8 appellant contends that the trial court erred in several particulars regarding an ordinance in Cameron limiting speed of trains to 30 miles an hour.

Appellant filed a motion in limine asserting that the Cameron ordinance was invalid and would not be admissible in evidence because it had not been published. The motion was presented a short time before commencement of voir dire examination of the jury. The trial court overruled the motion and advised counsel that a ruling would be made on admissibility of the ordinance at the time offered in evidence.

During voir dire examination counsel for Ham told the panel that the crux of the lawsuit was the violation of an ordinance in Cameron limiting the speed of trains to 30 miles an hour. Ham had pleaded the ordinance, and the pleadings were read to the jury empaneled.

The ordinance in question is not in evidence. In a hearing not in the presence of the jury testimony was offered by both plaintiff and defendant as to whether the ordinance had been published as required by law. The record does not disclose

whether, after the hearing, plaintiff declined to offer the ordinance, or whether it was offered and excluded by the court.

■ It was within the discretion of the trial court to overrule the motion in limine with respect to admissibility of the ordinance and to reserve the question for such time as the ordinance might be offered in evidence. Counsel for plaintiff was entitled to inform the panel what plaintiff expected to prove, within the limits of the pleadings. It was not error to permit counsel to read plaintiff's petition to the jury selected to try the case.

During deliberations of the jury, the trial court received an inquiry from the jury: "Was it established by evidence that 30 M.P.H. was the lawful speed limit for trains through Cameron?"

The trial court's reply to the jury consisted of this instruction: "In answer [to your question] * * * you are instructed that the Court cannot answer this question, other than to instruct you that you are to consider only the evidence introduced before you."

Appellant contends that the trial court should have instructed the jury that there was "not any evidence before them with regard to any lawful speed limit for trains through Cameron."

■ We agree with appellee that if the trial court had so instructed the jury, the instruction would have amounted to a comment on the weight of the evidence. Rules 286, 272, Texas Rules of Civil Procedure.

As appellee points out, there was some evidence that the lawful speed limit was 30 miles per hour. Ham testified without objection:

"Q Now what speed was the posted speed for this train to run through Cameron?

"A Well I thought it was thirty miles an hour through Cameron, Brenham and Temple. That was my understanding ever since I worked on the railroad.

"Q It was supposed to run through here thirty miles an hour?

"A Cameron, Brenham and Temple thirty miles an hour."

Appellant's points of error 4 through 8 with regard to the Cameron ordinance regulating speed of trains are overruled.

Appellant's eleventh point of error is stated in this language:

"The Trial Court should have granted Defendant's Motion for New Trial in this cause because the damages of $79,463.75 awarded by the jury are without support in the evidence, contrary to the overwhelming weight and preponderance of the evidence, and so excessive in view of the evidence in this cause as to obviously be the result of passion, prejudice, sympathy or other improper factors considered by the jury in arriving at such damages."

In connection with this point appellant requests this Court " * * * to consider the rulings on evidence by the Trial Court, subject to the remaining Points of Error and the Statement, Argument and Authorities in connection with each such Point."

The remaining points, numbered 12 through 15, assert error of the trial court (1) in admitting testimony that a single premium annuity providing an annual income of $10,000 would cost $101,527 for a person 66 years old because such cost was not a proper measure of damages; (2) in excluding testimony that Ham had pleaded guilty to receiving and accepting wagers without registering and paying a federal occupation tax to engage in such business; (3) in excluding testimony that Ham had told a treating physician that some of his physical complaints were caused by his gambling conviction; and (4) in excluding newspaper and city directory excerpts as proof that Ham was an owner of the H & H Lounge in contradiction of his statement

at the trial that he had no ownership interest in the lounge.

Under Rule 440, Texas Rules of Civil Procedure, a court of civil appeals, if the "court is of the opinion that the verdict and judgment of the trial court is excessive," may suggest remittitur of the excess, and if remittitur is not filed, the appellate court may reverse the trial court's judgment. The court of civil appeals is required to exercise "its sound judicial judgment and discretion in the ascertainment of what amount would be reasonable compensation." Kansas City Southern Railway Company v. Powell, 411 S.W.2d 633 (Tex.Civ.App., Beaumont, 1967, no writ), and cases cited.

■■■ For the court of civil appeals to exercise such judgment there need not be extraneous proof of passion, prejudice, sympathy, or any other proof showing that the jury was improperly motivated. Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835 (1959); Dallas Railway and Terminal Co. v. Farnsworth, 148 Tex. 584, 227 S.W. 2d 1017 (1950). In determining whether the verdict of the jury was excessive, the court of civil appeals must first arrive at a conclusion, after review of the evidence, as to what sum would be held to be reasonable if it had been assessed by the jury. Texas and New Orleans Railroad Co. v. Syfan, 91 Tex. 562, 44 S.W. 1064 (1898); Flanigan v. Carswell, supra.

Before reviewing the evidence to arrive at a determination of whether the verdict was excessive, we will dispose of the points dealing with evidence admitted and excluded by the trial court and complained of under points 12 through 15.

■■■ Appellant objected to the admission of testimony concerning a single premium annuity on the ground that it was not a proper measure of damages. It is contended that single premium annuities cannot be a proper measure of damages because profits of the insurance company and commissions of the agent are included.

The rule in Texas is that such testimony is admissible. Gulf, Colorado & Santa Fe Railway Co. v. Hampton, 358 S.W.2d 690 (Tex.Civ.App., Eastland, 1962, writ ref. n. r.e.) and cases cited 358 S.W.2d 691, col. 2.

By points 13 and 14 appellant urges error of the trial court in excluding evidence that Ham had pleaded guilty to violation of statutes requiring registration and payment of an occupation tax to receive and accept wagers. The matter had been presented to the trial court in a motion in limine filed in Ham's behalf, and the trial court had properly ruled that the evidence was not admissible.

Ham testified that he complained to the doctors who saw him that he could not sleep and was nervous. When Ham was asked what reasons he gave to the doctors for his nervousness and sleeplessness, the court admonished counsel for appellant that he appeared about to violate the ruling on the motion in limine. Outside the presence of the jury Ham denied having told the doctors anything about the charges against him or his conviction growing out of the charges. Appellant offered excerpts from hospital records that included notes of a doctor indicating that Ham was the center of difficulty with the federal government in a gambling indictment and that a gambling conviction had contributed to depress Ham. The trial court excluded such portions of the doctor's notes, making reference to indictment and conviction of Ham, but otherwise admitted into evidence the hospital records with the notations of the doctor, without such references.

The chief physician of the Santa Fe Hospital was permitted to testify at some length regarding the history of Ham's physical condition, extending from 1962 to a date beyond the accident in August, 1967, which formed the basis of this lawsuit. From this testimony it was shown that Ham, as early as November, 1962, some five years before the accident, was considering retiring because he felt his condition

was such that he was not able to continue working. Ham's complaints at that time were his weight (approximately 250 pounds), pain in his ankles, knees, neck, and right shoulder. After examination of Ham, the doctors recommended a leave of absence for him.

Examinations made in 1962 showed Ham was suffering from arthritis in his knees, ankles, feet, and to some extent in his spine. When Ham returned to pick up the report of his examination in 1962 he indicated that he had changed his mind about retiring, but would stay on leave of absence for a while. Medical records, further showed that between 1962 and 1967 Ham had been advised repeatedly to reduce his weight but that he had not been successful in losing weight. Ham testified that annual physical examinations, beginning in 1945, showed he was "too heavy." His admitted weight at the time of the accident was 242 pounds.

The chief physician also testified that when Ham was examined in 1967 after this accident, the arthritic condition was more severe than in 1962 and that he continued to suffer from sugar diabetes. The doctor attributed Ham's condition, which was described as permanent disability from performing his usual work, to Ham's age, his obesity, his worry, his arthritis and the accident in August, 1967.

■ The trial court correctly excluded evidence of Ham's indictment and conviction, including references made in the medical reports to such matters. In view of the testimony admitted as to physical ailments and disabilities existing prior to the accident, exclusion of evidence as to the indictment and conviction, even if improper, would be harmless and not substantially prejudicial to appellant's defense. Points 13 and 14 are overruled.

At the trial Ham denied that he was an owner of the H & H Lounge, but admitted that he had worked there as the manager. Ham contended that the only reason he was no longer working for the Santa Fe

was that he was completely incapacitated as a result of the injuries he received August 10, 1967. Appellant sought to introduce excerpts from the Temple city directory indicating that H & H Lounge was owned by Barney Ham and Opal Harrison and a news story from a Temple newspaper identifying Ham as being charged with acceptance of wagers at "his H & H Lounge in Temple during the period from July 1, 1966, to June 30, 1967." The trial court excluded both the city directory entries and the newspaper article.

Under its fifteenth point appellant contended it had the right to introduce such evidence to establish that Ham was prompted to retire from his Santa Fe employment in order to devote time to a going business in which he had an interest, and that his retirement was not due to the injuries he received in August of 1967.

As pointed out by appellee, the attempted foundation for introduction of the directory and the news story was not laid during the presentation of evidence, but during examination of the jury on voir dire, when counsel for the railroad turned from the jury and asked questions of Ham in the presence of the panel as to his ownership in the H & H Lounge. During the trial Ham testified under examination by his counsel that he once worked as manager of the lounge for which he drew a salary but denied he ever owned any part of the business. The evidence which the trial court excluded was offered by appellant while perfecting a bill of exception out of the hearing and presence of the jury. At that time Ham denied the accuracy of both the city directory and the news story in the Temple paper.

■ Both the city directory entries and the newspaper article were properly excluded as hearsay. The point is overruled.

Appellant contends that the jury's finding of damages in the amount of $79,463.75 is without support in the evidence and contrary to the overwhelming weight and pre-

ponderance of the evidence. We agree that the damages found are excessive.

The plaintiff, who was born in 1900, had worked for the railroad for 48 years, beginning as a brakeman in 1919. When he was injured in August, 1967, Ham was thrown toward the back of the caboose and hit on a chair. He testified that he was knocked out for a short time, estimated between four and eight minutes. Ham received a call from the conductor, directing him to go forward to the point of collision with a walkie-talkie to maintain communication with the engine so the several crossings could be cut. The conductor testified that Ham told him he had been hurt but did arrive with the walkie-talkie. The conductor sent Ham to a hospital. At the hospital Ham received a shot and called his nephews to take him to the Santa Fe Hospital in Temple.

After he was hurt Ham remained in the hospital about ten or fifteen days, after which he went as an out-patient to both the Santa Fe Hospital and Scott and White for therapy. He also went to Marlin and took 30 or 40 baths. Since his injury some 10 or 12 doctors have examined and treated Ham. Examinations failed to disclose any broken bones.

Ham testified that when the collision occurred and he was thrown by slack action of the train, he injured the lower part of his back and received a lick on the back of his head. Ham also testified that at the time of trial he was wearing a brace on his lower back and wore it at all times he was up. Ham said the back injury affected his walking and the blow on his head caused headaches. Ham testified that he was never completely free of pain and never had a good night of sleep. It was Ham's testimony that he had no intention of retiring when he was injured, worked regularly, and figured he had six to eight more years of work.

At Santa Fe Hospital following the accident Ham was seen by a doctor whose examination disclosed no fractures, pain in the lower back area. The doctor's diagnosis was back strain, osteo arthritis, and obesity. The doctor testified that he saw Ham as an out-patient the remainder of 1967 and reached the opinion that from a physical, mental, and emotional standpoint Ham was not able to continue working as a brakeman. The doctor testified that Ham's osteo arthritis and his diabetic condition pre-existed the accident and that these ailments would have incapacitated Ham in time regardless of the accident. The doctor agreed that the accident aggravated Ham's condition. The doctor also related treating Ham for a fall, after the train accident, which occurred in a Temple bank, and stated that this fall would aggravate Ham's condition.

The chief physician of Santa Fe Hospital testified at length from hospital records covering Ham's case for a period of several years. The record reflected that Ham had been seen by a neurologist who made extensive tests and had been seen by a psychiatrist, in addition to the first doctor who had seen him the day of the accident and during the latter part of 1967. Ham had been examined in 1962 at the hospital when he complained of pain in his ankles, knees, neck, and right shoulder and told the doctors he wanted to apply for a disability annuity because he believed he could not keep working. After obtaining a recommendation for leave of absence, Ham decided not to retire. At that time he was found to have arthritis in his knees, ankles, feet and to some extent in the lower part of his back. The following year, 1963, he was found to have sugar diabetes.

After examining Ham, the psychiatrist concluded that he had an intricate problem, "much of which stems from his psychopathic tendencies," and that his current problem was compounded by his indecision regarding retirement. The doctor further found that events of the accident and ill health of his wife had depressed Ham. This diagnosis was made during the months following the accident.

The chief physician testified that several conditions contributed to Ham's total physical health. "One," the doctor said, "would be his age, his obesity, his worry, his arthritis and with the history of this incident, all these factors would contribute to the fact that this man in my opinion would not be physically able to continue to work as a switchman and work in a safe manner."

In the opinion of the chief physician the incident in August, 1967, was one of several factors that eventually would culminate in Ham's retirement, and that the accident triggered the condition. The anxiety, tension, and nervousness of which Ham complained, the doctor testified, could be the result of numerous things.

Ham's average annual earnings based on a 24-month period preceding the accident were $8,180.82. From January 1 to August 10, 1967, Ham had made $6,252.57.

A life insurance agent testified that at age 66 the average life expectancy is 12.02 years, and that for a $10,000 annual annuity to be paid for life, based on age 66, the cost would be $101,527, and that the quoted figure included a substantial amount for profit to the insurance company.

A consulting actuary, stipulated to be highly qualified, testified with regard to development of statistics reflecting the work life expectancy of railroad employees. It was his testimony that according to these tables the work life expectancy of a man 66 years of age, as a railroad employee, would be 2.82 years, as compared with a life expectancy of slightly more than 12 years.

The actuary's calculations disclosed the present value of Ham's future earnings, based on his work life expectancy and a current rate of interest at 4 percent, to be $16,513, or $16,247 based on 5 percent interest.

Ham testified that he was retired by the Santa Fe after the accident for physical disability and was drawing a pension from the railroad.

The trial court instructed the jury that any amount allowed for decreased ability to work and earn money and any amount for mental and physical suffering" * * * must be such sum as is the present value thereof, and in determining the present value thereof you must take into consideration the rate of interest compounded annually at which money can be safely and securely invested and determine the present value of any amount you so allow by discounting the same or deducting therefrom annually an amount equal to the rate of interest during the period for which you may allow such damages, and make the balance your answer."

The verdict of the jury awarding damages of nearly $80,000 is grossly in excess of any sum based upon calculations reasonably made under the facts of this case. The plaintiff at the time of the accident was 66 years of age, with less than three years in which to work, and slightly more than 12 years life expectancy. His earnings were about $8,120 yearly. For five years or more before the accident Ham had been suffering from osteo arthritis, overweight, and diabetes. At one time the pain had been such that he considered retiring and applying for a disability annuity. It is true the accident aggravated these ailments, but the doctors stated that Ham would have been forced to retire, due to the combination of his disabilities, even though the accident had not triggered his retirement. Adding to $16,513, the highest figure the actuary produced, a calculation of $12,300 earnings during 18 months between the accident and the date of trial, the total is $28,813. If to this sum is added $12,000 for future additional pain triggered by the accident, a total of $40,813 is reached. Beyond this sum, we regard the award as excessive and not supported by the evidence.

Considering the evidence and the authorities cited by both parties, this Court under

Rule 440, Texas Rules of Civil Procedure, finds the judgment excessive and suggests a remittitur of $38,650.75. Missouri Pacific Railroad Company v. Kimbrell, 160 Tex. 542, 334 S.W.2d 283 (1960), citing Gulf, Colorado & Santa Fe Ry. Co. v. Deen, 159 Tex. 238, 317 S.W.2d 913, certiorari denied 359 U.S. 945, 79 S.Ct. 725, 3 L.Ed.2d 678.

If appellee files in this Court, within fifteen days from the date of this opinion and judgment, a remittitur of $38,650.75, the judgment of the trial court will be reformed and affirmed for the sum of $40,813.00. If remittitur is not so filed, the judgment will be reversed and remanded.

Affirmed on condition remittitur be filed.

HUGHES, Justice (dissenting).

The disturbing question in this case is whether a finding that a non-negligent act of the defendant was the sole proximate cause of plaintiff's injuries conflicts with other issues finding defendant guilty of negligence which was a proximate cause of his injuries, and, if so, the effect of such conflict. It is obvious, of course, that there is a conflict. Whether the conflict is fatal to the judgment is not so obvious.

The majority cites authorities to the effect that the issue of "sole proximate cause" is not available to a party as to his own acts but is used only with reference to the acts of a third party or an extraneous occurrence. The basis for these decisions is that since a proximate cause both as to primary negligence and contributory negligence is sufficient for the purpose of rendering judgment the issue of "sole proximate cause" should not be used since its use would likely result in conflicting findings. See Lewis v. Lansing, 325 S.W.2d 214, Tex.Civ.App., Fort Worth, no writ (1959).

However, there are certain instances when the issue of sole proximate cause is proper even as between parties. See Sec. 22, p. 58, Hodges on Special Issue Submission in Texas.[1]

It seems to me that it is proper to inquire if a non negligent act of the defendant is the sole proximate cause of plaintiff's injuries for the same reason that it is proper to inquire if the act, negligent or non-negligent, of a third party or an extraneous incident is the sole proximate cause of his injuries. The reason is that in the tort field a person is not liable for any injury or damage that is not a consequence of his negligence.

I would hold that there is a conflict in the jury answers as contended by appellant and would reverse and remand this case. I, therefore, respectfully dissent.

If the case is to be affirmed, I respectfully dissent from that portion of the majority opinion which requires a remittitur to avoid reversal. In my opinion, the verdict as to damages is not excessive. See Texas Consolidated Transportation Co. v. Eubanks, 340 S.W.2d 830, Tex.Civ.App., Waco, writ ref., n.r.e. (1960). (Railroad engineer, 63 years of age at time of death, $9,000.00 per year earnings. $125,000.00 award to evidence and $37,500 to 13 year old daughter not excessive.) Missouri Pacific Railroad Company v. Ramirez, 326 S.W.2d 50, Tex.Civ.App., Waco, writ ref., n.r.e. (1959). (Life expectancy of railroad employe was 20.64; he had 4th grade education and earned $6,223 per year. Award of $90,000.00 sustained.) Missouri Pacific Railroad Co. v. Goodson, 345 S.W.2d 569, Tex.Civ.App., San Antonio, writ ref., n.r.e. (1961) (Award of $85,000 to 54 year old brakeman earning about $7,500 per year sustained.)

This is the first case this Court has called for a remittitur where damages found by the jury are within the pleadings and evidence since January 1, 1947, prior to which date, I am not now informed.

I respectfully dissent.

---

1. As where there are multiple defendants each accused of negligence. As between such defendants the issue is proper.

Supplemental Opinion

O'QUINN, Justice.

William Barney Ham, appellee, filed a remittitur of $38,650.75 on May 21, 1970, in compliance with the suggestion of remittitur by this Court in our opinion of May 6, 1970. The judgment of the trial court is reduced by the amount of such remittitur, and as so modified the judgment of the trial court is affirmed.

Remittitur filed.

Judgment modified and as modified, affirmed.