SOUTHERN STEEL COMPANY, Appellant,

v.

Tom B. MANNING, Appellee.

No. 5349.

Court of Civil Appeals of Texas, Waco.

Aug. 16, 1974.

After Filing of Remittitur Aug. 22, 1974.

Rehearing Denied Sept. 12, 1974.

Alfred W. Offer and Roy D. Quillian, III, San Antonio, for appellant.

Kelsoe & Paternostro, R. Jack Ayres, Jr., Dallas, Helm, Jones & Pletcher, George E. Pletcher and David H. Burrow, Houston, for appellee.

## OPINION

JAMES, Justice.

This is a case wherein the Plaintiff-Appellee Tom B. Manning suffered personal injuries as a result of having been thrown from a jeep on a deer hunt. Manning sued Defendant-Appellant Southern Steel Co. for damages growing out of an accident which occurred on or about November 15, 1970 at about 4:30 A.M. in the dark, when Manning fell from the rear of a jeep taking a hunting party to deer blinds on Riverbend Ranch in Kerr County, Texas.

Trial was to a jury which found:

No. 1: An agent, servant, or employee of Southern Steel failed to properly latch the tailgate as would have been done by a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances.

No. 2: That such failure was a proximate cause of the occurrence in question.

No. 3: That Manning's failure to have both feet inside of the jeep on the occasion in question was negligence.

No. 4: But failed to find it was a proximate cause of the occurrence in question.

No. 5: That immediately prior to the occasion in question Manning failed to hold onto the Jeep.

No. 6: That such failure was negligence.

No. 7: But failed to find it was a proximate cause of the occurrence in question.

No. 8: The jury failed to find that Manning failed to keep a proper lookout.

No. 9: Not answered, as it was conditionally submitted upon an affirmative answer to No. 8.

No. 10: The jury found $8,134.14 for past medical and hospital expenses.

No. 11: The jury found $33,600.00 for past and future pain and mental anguish, past lost earnings and loss of earning capacity in the future.

Based upon the jury verdict, the trial court awarded Plaintiff Manning a judgment against Defendant Southern Steel for $41,734.14, from which Southern Steel appeals.

Appellant asserts Plaintiff-Appellee has no pleading to authorize the submission of Special Issues Nos. 1 and 2. We overrule this contention. The pertinent pleadings of Plaintiff read as follows:

"II.

Plaintiff would show that on or about November 15, 1970, he was a business invitee of the defendant at the Riverbend Ranch, near Hunt, in Kerr County, Texas, and at approximately 4:30 o'clock a. m. he was seriously injured as the result of an accident. Plaintiff was riding in the back of a 1957 Jeep pickup being operated by an employee of the defendant when the tailgate of said pickup came open and plaintiff fell to the ground.

"III.

The occurrence of November 15, 1970, which is made the basis of this suit, was proximately caused by the negligence of the defendant, its agents, servants and employees by the following acts of omission and/or commission:

(a) In failing to latch the tailgate.

(b) In failing to warn plaintiff that the tailgate was unlatched.

Each and all of the foregoing acts of omission and/or commission were negligent and constituted negligence and were each and all, jointly and severally, a proximate cause of the injuries and damages sustained by plaintiff, Tom B. Manning."

The trial court submitted Special Issue No. 1 as follows:

"Do you find from a preponderance of the evidence that on the occasion in question an agent, servant or employee of Southern Steel Company failed to properly latch the tailgate as would have been done by a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances?

Answer 'We do' or 'We do not.' "

To this issue the jury answered, "We do."

Special Issue No. 2 submitted proximate cause in the usual manner, which the jury answered in the affirmative.

■■■ In short, Plaintiff's pleadings charged Defendant with having failed to latch the tailgate, whereas Special Issue No. 1 inquires whether Defendant failed to properly latch the tailgate. This pleading is manifestly sufficient to give the Defendant fair notice of what it is called upon to defend. See Rule 45, Texas Rules of Civil Procedure. The trial court is not required in a special issue to follow the exact language of the pleading. McDonald, Texas Civil Practice, section 12.07; Texas Steel Co. v. Rockholt (Texarkana, Tex.Civ.App. 1940), 142 S.W.2d 842, writ refused; Green v. Walgreen Drug Co. (Beaumont, Tex.Civ.App.1963), 368 S.W.2d 688, error refused NRE.

■■■ Appellant attacks special issue No. 1 as being "global" and a general charge, and says it is not a finding as to any spe-

cific omission. We overrule this contention. See Hammer v. Dallas Transit Co. (Tex.Sup.Ct.1966), 400 S.W.2d 885. Moreover, at the time this case was tried (trial began September 4, 1973), Rule 277, Texas Rules of Civil Procedure as now amended and constituted, was in effect, said Rule as now constituted having gone into effect September 1, 1973. Under present Rule 277, Special Issue No. 1 could not possibly be subject to the objection that it is too broad, global, or a general charge.

■■■ Appellant further contends that Plaintiff failed to request and secure a finding that the matter inquired about in Special Issue No. 1 was within the "course and scope of employment" of the Defendant; and having failed to request and secure such finding, Plaintiff has waived Issues Nos. 1 and 2. In other words, Defendant-Appellant says the Plaintiff had the duty to secure a jury finding to the effect that Defendant's agent, servant, or employee was acting within the scope of his employment when he failed to properly latch the tailgate; and having failed to secure such finding, Plaintiff has waived the jury's finding to Special Issue No. 1. We do not agree. In the first place, we have carefully examined the Defendant's pleadings and we cannot find any special exception bringing to the trial court's attention a failure on the part of Plaintiff to allege that Defendant's agent, servant, or employee was acting within the scope of his employment. Then in its objections to the court's charge, Defendant made no objection to the failure of the trial court to submit an issue on whether or not Defendant's agent, servant, or employee was acting in the scope of his employment. Under this state of the record, Defendant has waived this defense unless the contrary is conclusively established by the evidence. Such is not the case here. We will discuss the evidence later in this opinion, but suffice it to say at this time that there is nothing in the record to show that any of Defendant's servants, agents and employees present at the time of the accident were not acting

within the scope of their respective employments. Rules 90, 279; Meacham v. Loving (1956), 155 Tex. 279, 285 S.W.2d 936. Even if the question were disputed in the evidence, Appellant urges this defense for the first time in his Motion for Judgment NOV and his Amended Motion for New Trial. This is too late. Special Issue No. 1 was submitted insofar as the agency aspect was concerned, without objection, and therefore the issue on the "scope of employment" was an omitted issue within the meaning of Rule 279. Since neither party requested a written finding by the trial court on the issue in question, the issue is deemed found in support of the judgment.

■ Appellant further asserts that "Plaintiff was fully aware of the condition of the latched tailgate on the defendant's cab-over jeep prior to starting on the hunting trip in question, and the Plaintiff was as familiar with the tailgate as anyone else, the condition of the tailgate and the latches thereon being as open and obvious to the the Plaintiff as to this Defendant or any of its employees, and this Defendant owed no duty to the Plaintiff in regard to the tailgate and the latches thereon." As we construe this point of error, the Defendant-Appellant is asserting the defense of either "assumption of risk" or "volenti non fit injuria," raising such defense or defenses for the first time in its Motion for Judgment NOV and in its Amended Motion for New Trial.

■ Appellant did not plead these defenses, neither did it request any issues to be submitted to the jury, nor did Appellant object to the trial court's failure to submit issues on these defenses. Under this state of the record, Appellant has waived these defenses. See Rules 94 and 279, Texas Rules of Civil Procedure. As regards "assumption of risk" and "volenti non fit injuria," the burden of pleading, proof, and submission of issues is upon the Defendant. See "Assumed Risk" by Justice Joe Greenhill in 20 Southwestern Law Journal

1 (1966); Chickasha Cotton Oil Co. v. Holloway (Amarillo, Tex.Civ.App.1964), 378 S.W.2d 695, error refused NRE. By Appellant's failure to plead these defenses, or request submission of issues thereon, or to object to the trial court's failure to submit issues thereon, Appellant has waived its right to assert these defenses or either of them. Rules 94 and 279, T.R.C.P.

■ Appellant contends that there is no evidence, and insufficient evidence to support the jury's answers to Special Issues Nos. 1 and 2; that is to say, that the evidence is legally and factually insufficient to support the jury's answers to said issues. We overrule these contentions, as we find the evidence to be ample to support such jury findings. At this point a review of the pertinent evidence is necessary:

Plaintiff-Appellee Tom B. Manning was 54 years old at the time of the accident, in good health, and weighed 210 to 215 pounds. He had had a high school education and had done pipeline and construction work, and had served three years in the Marines in World War II before going to work for the Texas Department of Corrections in 1960. He started in as a carpenter foreman in 1960, working prison inmates on construction jobs, was promoted to assistant superintendent of construction in 1962 and then to general superintendent in 1967, and was working in that capacity at the time of the accident. His job consisted of supervision of all types of construction work, and required a lot of walking and being physically present where the work was being carried on.

Included in Defendant-Appellant Southern Steel Company's business activities is the selling of steel security equipment, the type of steel fabrication for which the Texas Department of Corrections would have a need, and be an actual or potential customer. Southern Steel owned the Riverbend Ranch near Hunt, in Kerr County, Texas, upon which were located deer blinds for hunting purposes, for the use

and enjoyment of not only Southern Steel's officers and employees and their families, but also for the entertainment of Southern Steel's actual and potential customers and their families.

Plaintiff-Appellee Manning and his wife Ruth, and Manning's brother and his wife were invited as guests for deer hunting on Riverbend Ranch for the weekend when the accident in question occurred.

The company personnel and guests for the deer hunt were put up in a lodge located on the ranch. Everyone participating in the hunting on this Sunday, November 15, 1970, were awakened at 4 o'clock A.M., after which the hunters dressed and were fed breakfast. They were ready to leave the lodge between 4:30 A.M. and 5:00 A. M. Of course, at this time of day at this time of year it was pitch dark and on this particular morning it was about 31°. The hunters were therefore dressed in appropriate bulky hunting clothing for the weather. Southern Steel had two jeeps parked in a patio near the lodge which were there for the purpose of taking the hunters and their guns to their respective deer blinds. The jeep in which Plaintiff-Appellee Manning rode was a 1957 Willys cab-over jeep. It had a cab in front to accommodate the driver and one other passenger. In behind the cab was a truck-type bed six feet long and 5 feet 8 inches wide. On either side running from cab to tailgate was seating about a foot in width with a canvas and foam rubber cushion over each, and a cushion back rest behind each seat. There were three steel bows or stanchions to hold up the tarp cover over the rear bed, located respectively at the rear, center, and front of the rear seating area.

The steel tailgate across the back was 59 inches wide and 22 inches high, and had latches at either end. Each latch was a round steel bar bent into a "U" shape, and as bent double is 3 or 4 inches long, each hanging on a steel chain anchored to the rear of truck bed. When the tailgate is properly latched, each latch is inserted through two eyelets, one on the truck bed and the other on the tailgate, so that the two eyelets are at the top of the "U", and the "U" is in an upside down position.

Underneath the tailgate all the way across is a wide steel bumper, which protrudes rearward a few inches beyond the tailgate. The jeep truck is twelve feet in length overall.

The hunters usually loaded up in the jeep in such a manner that those to hunt in the blinds farthest away would sit in next to the cab, and so on, so that those to get off first at the nearest blinds would sit at the rear. Manning was due to hunt at one of the nearest blinds, therefore he would be one of the last to board. The driver of the jeep was A. W. McClain, 52 years old, a maintenance employee and handyman of Southern Steel, whose job it also was to drive and take care of the jeep in question at the ranch during hunting season. Plaintiff's wife, Mrs. Ruth Manning, was in the cab in the right front. There were six hunters seated in the back, three on each side, as follows: I. C. Trimble, general manager and a director of Southern Steel was seated next to the tailgate on the left hand side as you face from the rear of the jeep towards the front. Trimble was seated opposite from and facing Manning, who was seated on the right hand side next to the tailgate. The other four hunters in the rear were: Harold L. Dreeke, company salesman and sales engineer for Southern Steel; Hal Atkins, purchasing agent for Southern Steel; Frank Oveido, shop foreman for Southern Steel; and Hull Youngblood III, a college sophomore student whose father was president of Southern Steel. With the exception of Trimble and Plaintiff Manning, the seating arrangement is disputed; however, there were three men on each side. In the center of the bed was a No. 3 washtub in which was some loose corn and a 50 lb. bag of corn. Each hunter had a rifle and a shotgun. Some held their rifles and shotguns between their legs and others laid them on the floor. At any rate, it was

a crowded condition with six men clothed for cold weather with two guns each, together with the tub and corn in the middle, all inside a six feet by six feet truck bed.

When all had loaded up except Manning, the jeep would not start. Manning brought his own pickup over with jumper cables and got the jeep started, and then Manning, being the last to get in the jeep truck, loaded up.

Manning testified that when he got in, there was not sufficient room for him to put both his feet inside the jeep; therefore, he put his right foot inside the jeep and put his left leg over the tailgate and rested his left foot on the bumper. The terrain from the lodge to the deer blinds is very steep, rough, and rocky. Manning testified they were going up a "real steep" incline, "about a forty-five degree angle," when the jeep hit a rock or a bump, and at this moment, "the entire tailgate just flew open" and when it came loose it caught his left leg and pulled it. He grabbed "this half inch pipe" (the rear bow or stanchion) and held on, "and that made it worse and I pulled, I bent the pipe, I don't remember whether I pulled it completely off or not, but I remember holding on to it because I was falling, you see. When I finally let go, I hit the ground and when I hit the ground and rolled over I was facing away from the truck and I couldn't get up." An ambulance was called from Kerrville which arrived 45 minutes to an hour after the accident, which took Plaintiff to a hospital at Kerrville. It developed he had a compound fracture of his left hip. He was flown to Houston for further medical treatment.

Manning testified that if both sides are properly latched, there is "no way" the tailgate will come open.

Trimble made a written, signed statement shortly after the accident in which he said, "the tailgate flew open and it threw Tom Manning out." Then in his testimony in court, Trimble said the tailgate came open but he didn't know whether it came open on only one side or both sides. He said when he loaded into the jeep, the tailgate was closed, but he did not know whether one latch was hooked, or both latches, or none. He further testified that he did not know of anything Manning did to cause the tailgate to come open.

Trimble testified when the jeep hit the rock or bump that caused the accident that Manning was thrown over toward him and, "when he started falling out he fell over against me and grabbed me and had a hold of me and if he hadn't turned loose when he did, I would have been out there with him. I had my arm around the stanchion and also had my left arm holding on to the seat and—I thought sure I was going, that he was going to take me with him and then he turned loose." Trimble said he did not think the tailgate would "jump out on its own" if latched.

Oveido testified that he was the one who put the corn in the back of the jeep that morning, that he was the last man to load up into the jeep, and when he got in he did not remember whether the tailgate was open or closed. However, later on in his testimony he said it was closed. He said it would not be unusual for "nobody to bother to check the tailgate" before pulling out for the blinds. He said he did not know who was responsible for checking the tailgate. He did say the tailgate was open immediately after Manning was thrown out, although he did not see it fly open. He said there was "no reason for it to fly open. But it happened."

Hal Atkins testified that it was A. W. McClain's job as driver of the jeep to "check the truck and operate the truck."

Dreeke testified that at the time of the accident, "the tailgate flew open," and "when I saw Tom (Manning) the tailgate was down and he was in the air just like the jeep pulled out from under him." He further testified that if the two latches are put in properly, you normally would not expect the tailgate to fall loose. Dreeke said "usually the driver closes the tailgate."

Later on in his testimony, Dreeke testified "usually the driver always comes back and inspects the tailgate before we leave." He further testified when he loaded into the jeep, the latches to the tailgate were hooked, but he could not say whether they were hooked properly or improperly, because he "did not inspect them that close." He testified on cross-examination that it is possible the hooks might have been in there, but "not through all the way." He later testified again that it was the driver's job to come around and look and check the hooks on the back of the jeep before the trip would commence, and to "put up the tailgate and hook it and see that everybody was in."

The record is entirely silent on anyone present connected with Southern Steel having checked the tailgate in any manner before the jeep left for the deer blinds. McClain the driver was so busy trying to get the jeep started that he never got around to checking the tailgate or latching thereof, and nobody else connected with Southern Steel ever did any more than notice that the tailgate was closed. Appellant in his briefs and argument appears to be baffled at what is meant by the term, "properly latched." The record is plain that "properly latched" means that the hooks on both sides are all the way through both eyelets so that the top or crest of each "U" is resting on both eyelets. Anything short of this would mean the tailgate was not "properly latched." Defendant offered a picture in evidence showing the rear of the jeep, and showing one latch about halfway through the eyelets, so that the "U" is horizontal instead of vertical. Defendant's own exhibit is a good illustration of an improper latching of the tailgate. With the latches in this or any similar position, the tailgate could "fly open" with the jostling of the jeep over rugged terrain. In this state of the record, certainly the Defendant owed Plaintiff the duty to see that the tailgate was properly latched. The testimony given by Defendant's officers as above recited shows without dispute that it was the driver's responsibility to see that the tailgate was properly latched.

The evidence is legally and factually sufficient to support the jury's answers to Special Issues Nos. 1 and 2.

■ As stated above, Special Issue No. 11 was a damage issue in which the jury's consideration was limited to past and future physical pain and mental anguish, past lost earnings, and loss of future earning capacity, to which issue the jury answered $33,600.00. Appellant contends there is no competent evidence to warrant the submission of past lost earnings as an element of damages in this issue. We sustain this contention.

At the time of the accident, (November 1970) Plaintiff Manning was earning $1209. per month salary. In September 1972 he received a raise that increased his salary to $1259.00 per month. Manning testified that during his three periods of hospitalization and surgery and otherwise being unable to work it cost him 424 hours of his sick leave and 48 hours of vacation time or a total of 472 hours of working time; however, his salary was paid continuously all along. In other words, he never actually missed a payday. Manning worked a 40 hour week, which at 472 hours of lost working time amounted to 2.72 months. At a monthly rate of pay of $1259.00, the jury could have awarded him as much as $3431.48 for "past lost earnings" in answer to Special Issue No. 11.

At the hearing on the motion for new trial, five of the jurors testified as to how the jury arrived at the $33,600.00 figure in answer to Issue No. 11: The jurors were far apart at first. Then it was suggested that each juror write on a piece of paper the figure he thought proper and turn it in to the foreman, in order to arrive at a "base figure that we might work with." This was done, and the foreman added up the figures and divided the total by the number of the jurors. The average figure was rounded off at $30,000.00. One of the jurors, a Mrs. Lucas, testified without contradiction that the jury then added to this amount $3600.00 to compensate Manning for "either sick pay or vacation pay, and I am certain it was for sick pay."

■ Under the record before us, we find the verdict and judgment of the trial·

court excessive in the amount of $3600.00, and that said cause should be reversed for that reason only. Therefore if the Plaintiff-Appellee Manning within fifteen days shall file a remittitur in the amount of $3600.00, the judgment of the trial court will be reformed and affirmed for the balance in the amount of $38,134.14. Otherwise the trial court's judgment will be reversed and remanded for another trial. Rule 440, Texas Rules of Civil Procedure; Wilson v. Freeman (1916), 108 Tex. 121, 185 S.W. 993; Hill v. Texas, New Mexico and Oklahoma Coaches, Inc. (1954), 153 Tex. 581, 272 S.W.2d 91; Flanigan v. Carswell (1959), 159 Tex. 598, 324 S.W.2d 835; Missouri Pacific Railroad Co. v. Kimbrell (1960), 160 Tex. 542, 334 S.W.2d 283; A. T. and S. F. Ry. Co. v. Ham (Austin, Tex.Civ.App.1970), 454 S.W.2d 451, error refused NRE; Texaco, Inc. v. Forester (Beaumont, Tex.Civ.App.1970), 456 S.W.2d 196, error refused NRE; Caswell v. Satterwhite (Waco, Tex.Civ.App. 1955), 277 S.W.2d 237, error refused NRE; State v. Meyers (Waco, Tex.Civ. App.1956), 292 S.W.2d 933, error refused NRE; Missouri Pacific Railroad Co. v. Sims (Waco, Tex.Civ.App.1961), 350 S.W. 2d 405, error refused NRE; American Coach Co. v. Hopkins (Waco, Tex.Civ.App. 1962), 355 S.W.2d 83, error refused NRE.

We have carefully reviewed Appellant's remaining points of error and overrule them as being without merit.

The trial court's judgment is reversed and remanded. Costs of appeal are divided equally between Appellant and Appellee.

Reversed and remanded.

### AFTER FILING OF REMITTITUR

Plaintiff-Appellee Manning having filed remittitur in the amount of $3600.00 as suggested by this court, the judgment heretofore entered is set aside and judgment here entered reforming the judgment of the trial court in conformity with said remittitur, and as reformed the judgment of the trial court is affirmed.

Costs of appeal are divided equally between Appellant and Appellee.

Reformed and affirmed.